# 2006 DTA 96

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL II**

UNIÓN DE ABOGADOS DE LA C.F.S.E.
Peticionaria

v.

CORPORACIÓN DEL FONDO DEL SEGURO DEL ESTADO
Recurrida

Núm. KLCE-2005-01512

San Juan, Puerto Rico, a 7 de julio de 2006

Panel integrado por su Presidenta, la Juez Peñagarícano Soler,
y los Jueces González Vargas y Rivera Martínez

González Vargas, Troadio, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La Unión de Abogados de la Corporación del Fondo del Seguro del Estado (U.A.C.F.S.E., Unión, o peticionaria) presentó ante este Tribunal un Recurso de *Certiorari* solicitándonos que revisemos la Sentencia emitida el 6 de septiembre del 2005 por el Tribunal de Primera Instancia, Sala Judicial de San Juan (T.P.I.). En la Sentencia recurrida, el T.P.I. revocó el Laudo de Arbitraje que había sido emitido sobre esta controversia y concluyó que ciertos días declarados como "*feriados*" por proclama de la entonces Gobernadora de Puerto Rico deben ser cargados a la licencia de vacaciones, conforme a la recomendación hecha por el Contralor de Puerto Rico en el Informe de Auditoría CP-98-5. Ello, a pesar de que el Convenio Colectivo vigente entre las partes disponía que tales días no serían cargados a la licencia por vacaciones. El T.P.I. razonó que los convenios colectivos no pueden ir en contra de la "*política pública*" que establece el Contralor de Puerto Rico en cuanto a la utilización de los fondos públicos.

Examinadas las alegaciones de las partes, el derecho aplicable, así como dos sentencias emitidas por paneles hermanos de este Tribunal enfrentándose a una controversia similar, estamos en posición de resolver.

### I

El 22 de octubre del 2003, la entonces Gobernadora de Puerto Rico, Hon. Sila María Calderón, concedió a los empleados públicos el 24 de octubre del 2003 como día feriado con cargo a la licencia de vacaciones. Ello, con el objetivo de que los servidores públicos "*pudieran unirse al homenaje póstumo*" a Don Luis A. Ferré. Lo anterior fue informado por la Oficina Central de Asesoramiento Laboral y de Administración de Recursos Humanos mediante el Memorando Especial Núm. 43-2003 dirigido a los "*Jefes de Administradores Individuales del Sistema de Personal, Jefes de Agencias Excluidas de la Ley de Personal del Servicio Público, Alcaldes y Presidentes de Legislaturas Municipales*". █

Al día siguiente, el Lic. Nicolás López Peña, Administrador de la Corporación del Fondo del Seguro del Estado (C.F.S.E. o peticionada), suscribió un memorando dirigido a todo el personal en el cual informó que en vista de que el viernes 24 de octubre fue proclamado por la Gobernadora de Puerto Rico como día libre con cargo a licencia regular de vacaciones, todas las facilidades de la C.F.S.E., con excepción del Hospital Industrial, permanecerían cerradas. No obstante, algunos abogados de la C.F.S.E. tuvieron que comparecer a trabajar a unas Vistas Públicas citadas por la Comisión Industrial. Luego de culminadas las referidas vistas públicas, los abogados se personaron a sus respectivas áreas de trabajo y encontraron que las mismas estaban

cerradas.

Así las cosas, tanto a los abogados que no trabajaron ese día, como a los que trabajaron medio día, se les cargó el mismo a su licencia por vacaciones. Una situación similar a la anterior ocurrió en los días 2 y 5 de enero del 2004, los cuales también fueron concedidos por la Señora Gobernadora como días libres con cargo a la licencia de vacaciones con motivo de la celebración de las festividades navideñas.

Como consecuencia de los hechos anteriormente señalados, la U.A.C.S.F.E. radicó tres querellas ante el Comité de Querellas de la C.F.S.E. (Comité). ▉ En esencia, la Unión solicitó que se ordenara a la C.F.S.E. a que cese y desista de su actuación de cargar los días 24 de octubre de 2003, así como el 2 y 5 de enero del 2004 a la licencia por vacaciones, puesto que ello viola el Convenio Colectivo vigente. La Unión argumentó que de conformidad con el Artículo 20 Sección 2 del Convenio Colectivo, esos días no pueden ser cargados a la licencia por vacaciones que los abogados unionados tengan acumuladas. Ésta sostuvo que esos días tienen que ser pagados sin cargo a licencia alguna. En su parte pertinente, el Artículo 20 dispone:

*"Se considerarán, además, como si fueran días feriados y/o libres sin pérdida de paga (sin cargo a licencia alguna), aquellos días o medios días u horas que por Proclama u Orden Ejecutiva del Gobernador de Puerto Rico o del Presidente de los Estados Unidos, o por Ley fueran declarados como tales y se autoriza a los empleados a ausentarse del trabajo; disponiéndose, además, que a los empleados que se encuentren en uso de licencia no se les hará cargo por el tiempo concedido libre por este concepto."*

Por su parte, la C.F.S.E. argumentó que a raíz del Informe de Auditoría, CP-98-5, emitido por el Contralor de Puerto Rico el 4 de marzo de 1998, la práctica de no cargar a las licencias acumuladas los días concedidos mediante proclama del Gobernador, no es cónsona con la política pública de fiscalización. [3] Por ello que el Contralor recomendó a la C.F.S.E. que se abstuviese de conceder a sus funcionarios y empleados, días libres sin cargo a licencia de vacaciones acumuladas.

El 24 de mayo del 2004, se celebró la vista de arbitraje ante el Comité y el 27 de septiembre, [4] éste emitió Laudo concluyendo en lo pertinente que:

*"A la luz de la prueba, del Convenio Colectivo y de la política pública vigente en materia obrero-patronal, las abogadas y abogados de la [C.F.S.E.] **tienen derecho al pago, sin cargo a ninguna de sus licencias,** de los días 24 de octubre de 2003, 2 y 5 de enero de 2004."* (Énfasis nuestro).

El derecho al pago es por vía de restitución en el registro de licencias por vacaciones correspondiente en el caso de cada abogado(a) al cual se le descontaron días acumulados y en cuanto a los que fueron a trabajar el 23 de octubre de 2003, el pago es el dinero adeudado.

Inconforme con la decisión del Comité, el 19 de octubre del 2004, la C.F.S.E. presentó un Recurso de Revisión ante el TPI en el que cuestionaba la corrección del referido laudo obrero-patronal ante el T.P.I. En su único señalamiento de error, la C.F.S.E. dispuso que el Comité erró *"al no respetar las determinaciones del Contralor de Puerto Rico en cuestión de fiscalización de fondos públicos y también erró al no considerar o respetar las expresiones sobre ese asunto que hicieran el Tribunal de Primera Instancia y el Tribunal de Apelaciones de Puerto Rico".* ▉

Por su parte, el 18 de noviembre del 2004, la U.A.C.F.S.E. presentó infructuosamente ante el T.P.I. una *"Solicitud de Desestimación de Recurso de Revisión"*, debido a la omisión de acompañar documentos importantes al Recurso. En la alternativa, la U.A.C.F.S.E. solicitó al T.P.I. le concediera un plazo razonable para expresarse sobre la validez del laudo recurrido, en la eventualidad de que rechazara su solicitud de desestimación o entendiera que la omisión de la C.F.S.E. era subsanable.

Posteriormente, el T.P.I. dictó la Sentencia recurrida sin disponer de la Moción de desestimación y sin concederle a la Unión la oportunidad de oponerse al Recurso interpuesto por la C.F.S.E. En dicha sentencia, el T.P.I. revocó el Laudo de Arbitraje y concluyó que esos días debían ser cargados a la licencia de vacaciones de los empleados, con excepción de aquéllos que trabajaron el 24 de octubre del 2003, los que tienen derecho a que se les pague por el tiempo trabajado. El T.P.I. basó su Sentencia en lo previamente decidido por este Tribunal en cuanto a una controversia similar, pero con respecto a la Unión de Auditores Internos de la C.F.S.E.

Inconforme la U.A.C.F.S.E. con el dictamen revocatorio del T.P.I., acudió ante nos vía recurso de *certiorari*, imputándole a dicho foro la comisión de los siguientes dos errores:

"*Erró el Honorable Tribunal de Primera Instancia al no considerar el planteamiento hecho por la UACFSE de que el Recurso de Impugnación de Laudo de Arbitraje fue radicado omitiendo importantes documentos en su Apéndice sin el cual el recurso no fue perfeccionado. La omisión en proveer como parte del Apéndice tales documentos al Honorable Tribunal de Instancia privó a éste de elementos esenciales en los cuales descansa la determinación del Comité de Querellas y la corrección y suficiencia del Laudo emitido. En la alternativa, de considerarse perfeccionado el recurso a pesar de tales omisiones en los documentos, erró el Honorable Tribunal de [Primera] Instancia al adjudicar la solicitud de impugnación sin proveerle a la UACFSE la oportunidad de expresarse, a pesar de la solicitud oportuna formulada por dicha sindical.*

*Erró el Honorable Tribunal de Primera Instancia al revocar el Laudo de Arbitraje impugnado a base de un Informe de Auditoría de la Oficina del Contralor en menoscabo de las propias directrices emitidas por OCALARH y en abierta contravención a lo acordado por las partes en el Convenio Colectivo. Al hacerlo, el Honorable Tribunal modifica y altera las disposiciones contractuales acordadas por las partes en el Convenio Colectivo y viola la política pública laboral dispuesta en el Artículo 1 de la Ley Núm. 130 de 8 de mayo de 1945.*"

El 18 de enero de 2006, la C.F.S.E. presentó "*Escrito estableciendo posición y en oposición al recurso de certiorari*". Veamos el derecho aplicable.

## II

Mediante la Ley 45 del 18 de abril de 1935, según enmendada, 11 L.P.R.A. § 1b *et seq.*, se creó a la corporación pública del Fondo del Seguro del Estado (C.F.S.E.). Esta instrumentalidad del Gobierno funciona como una empresa privada, y por ello, el Art. II de la Sec. 17 de la Constitución del Estado Libre Asociado de Puerto Rico les reconoce a sus empleados el derecho a organizarse y negociar colectivamente por mediación de representantes de su propia y libre selección. *C.R.I.M. v. Fed. Central de Trabajadores*, 142 D.P.R. 968 (1997).

Igualmente, la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945, 29 L.P. R.A. § 61 *et seq.*, les reconoce a ellos el derecho a la negociación colectiva. En su Artículo 1, dicha Ley declara que:

"*a)* ...*es a través de la negociación colectiva el medio como deberán fijarse los términos y condiciones de empleo.*

*b) es la política del Gobierno eliminar las causas de ciertas dispuestas obreras, fomentando las prácticas y procedimientos de la negociación colectiva...*

*c)* ... *en el ejercicio de los derechos reconocidos a las partes en dichos convenios, como también en cumplimiento de las obligaciones que de ellos derivan, se atenderá la norma de una razonable reglamentación para lograr las normas contenidas en dicha ley.*"

Constituye un interés apremiante del Estado regular las relaciones obrero-patronales y proteger los derechos de los trabajadores. *Rivera v. Pan Pepín, Inc.*, **2004 J.T.S. 68**, 161 D.P.R. ____ (2004). Es por ello que esa área se encuentra ampliamente reglamentada por un esquema legislativo que persigue salvaguardar los derechos constitucionales concedidos a los trabajadores. *Vega y otros v. Caribe G.E. Products, Inc.*, **2003 J.T.S. 175**, 160 D.P.R. ____ (2003).

Como se sabe, el convenio colectivo es un instrumento de prioritaria importancia para la negociación colectiva en el campo laboral. *U.I.L. de Ponce v. Dest. Serrallés, Inc.*, 116 D.P.R. 348 (1985). Éste ha sido revestido de un alto interés público, pues representa el medio idóneo para alcanzar la armonía y estabilidad en las relaciones obrero-patronales. Además, el convenio colectivo proporciona a los empleados y al patrono mecanismos para la sana solución de discrepancias y desavenencias que puedan surgir entre ellos. *U.I.L. de Ponce v. Dest. Serrallés, Inc.*, *supra*. Se trata de un contrato que posee fuerza de ley entre las partes que lo suscriben y, por tanto, genera la ineludible obligación de cumplir con los términos en él acordados conforme al principio de *pacta sunt servanda*. *J.R.T. v. Junta Adm. Muelle Mun. de Ponce*, 122 D.P.R. 318 (1988).

La controversia de autos requiere adicionalmente que nos expresemos brevemente sobre la figura del Contralor de Puerto Rico. Dicho cargo es de creación constitucional. 1 L.P.R.A. Art. III, Sec. 22. A éste se le asigna la función de fiscalizar todos los ingresos, cuentas y desembolsos del Estado, de sus agencias e intrumentalidades y municipios para determinar si se han efectuado de acuerdo con la ley. El Contralor debe determinar la legalidad de todas las cuentas, los ingresos y los desembolsos de propiedades y fondos públicos. *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, 133 D.P.R. 945, 964 (1993). Asimismo, debe velar por el cumplimiento de la política pública contable, la cual procura la mejor utilización de los fondos públicos.

Esa política pública se recoge fundamentalmente en el Art. VI, Sec. 9 del Artículo VI de nuestra Constitución, la cual dispone que *"[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley"*. Adicionalmente, la Ley Núm. 230 del 23 de julio de 1974, 3 L.P.R.A. § 283 *et seq.*, conocida como la Ley de Contabilidad, establece como política pública del Estado *"diseñar y revisar los sistemas de contabilidad y procedimiento de pagos e ingresos y para producir los informes financieros y de las operaciones de las dependencias y entidades corporativas del gobierno según definidas para lograr así la mejor utilización de fondos"*. Sin embargo, la función esencial de la Oficina del Contralor es la de auditar y fiscalizar los cuentas, ingresos y desembolsos de las agencias, municipios, instrumentalidades y corporaciones públicas, ▆ sobre los fondos públicos asignados. El resultado de sus auditorias se recoge en un informe de hallazgos. Es, por supuesto, su responsabilidad advertir o señalar en sus informes cualquier irregularidad o violación detectada a las leyes, reglamentos o la política pública en ellos contenida, y en los casos apropiados, referir tales informes al Departamento de Justicia para la acción judicial o administrativa correspondiente.

Sobre otro particular, debemos recordar que, de ordinario, los *"laudos de arbitraje en el campo laboral merecen de los tribunales una gran deferencia, sobre todo cuando se haya acordado que no sean conforme a derecho. En estos últimos casos, su revisión sólo procede cuando se demuestra la existencia de fraude, conducta impropia del árbitro, falta de debido proceso de ley a las partes, falta de jurisdicción del árbitro, omisión de resolver todas las cuestiones en disputa o violación a la política pública"*. *J.R.T. v. Vigilante, Inc.*, 114 D.P.R. 581 (1990). Aun en los que deben ser conforme a derecho, por razón de la reconocida pericia de los árbitros en materia laboral y por tratarse de un instrumento ampliamente favorecido para la solución de las disputas obreras, se le reconoce una dilatada deferencia en los laudos que emitan.

Con el beneficio de la anterior exégesis doctrinal, así como del análisis de dos sentencias emitidas por paneles hermanos de este Tribunal, pasemos a disponer del recurso de autos. ▆

## III

La controversia principal de autos se recoge en el segundo señalamiento de error aducido por la U.A.C.F.S.E. Por tal razón, lo atenderemos en primer orden. Tal como mencionamos anteriormente, en el caso de marras tenemos dos sentencias emitidas por este Tribunal, una que favorece la posición de la parte peticionaria y otra que concuerda con la postura de la recurrida.

La U.A.C.F.S.E., argumenta que el Informe del Contralor ignora la política pública prevaleciente en nuestra jurisdicción, según la cual, mediante los convenios colectivos, las partes pueden negociar y acordar mayores beneficios que aquellos reconocidos en las leyes o decretos para los trabajadores en general. Igualmente, sostiene que dicho Informe ignora las órdenes emitidas por la propia Oficina de la Gobernadora en la que expresamente se indicaba que las agencias excluidas de la aplicación de la Ley de Personal se regirían conforme a lo dispuesto en sus reglamentos y convenios colectivos.

En resumen, la posición de la U.A.C.F.S.E. es que la actuación de la C.F.S.E. de dejar sin efecto de manera unilateral lo negociado en el convenio colectivo sobre el asunto en controversia viola tanto el convenio colectivo como la política pública vigente y la paz industrial.

Por su parte, la recurrida, C.F.S.E., argumentó que no le corresponde revocar, modificar o dejar de cumplir con la determinación del Contralor de Puerto Rico, puesto que esa es prerrogativa del propio Contralor y en última instancia, de los tribunales de justicia. Aduce, además, que las determinaciones y hallazgos del Contralor gozan de una presunción de legalidad y corrección, como toda determinación administrativa. ▪ A esos efectos, la recurrida sostiene que, habiendo *determinado el Contralor de Puerto Rico que la concesión de aquellos días que se dan libre por proclama del Gobernador(a) sin cargo a la licencia regular representan una regalía de fondos públicos, [ello] constituye una expresión de política pública fiscal*", que sólo puede ser revocada, modificada y revisada por los tribunales de justicia. Debido a lo anterior, la C.F.S.E. sostiene que el Comité no poseía la facultad, ni la autoridad en ley para revocar o dejar sin efecto señalamientos hechos por el Contralor de Puerto Rico.

La C.F.S.E. también alega que la peticionaria pretende que ésta viole el *"mandato o requerimiento del Contralor de Puerto Rico en aras de cumplir con algo acordado en la negociación colectiva"*. A tales efectos sostiene que *"[d]escartar, no cumplir, evadir o rechazar una determinación que haya hecho el Contralor de Puerto Rico sobre el uso de fondos públicos en una agencia de gobierno (como la C.F.S.E.), es hacer inoperantes las intervenciones de [éste]"*. Por ello, la recurrida entiende que *"la negociación colectiva no puede ir en contra de la política pública, ... sobre la fiscalización de fondos públicos"*, puesto que esa gestión le compete sólo al Contralor de P.R.

De entrada, debemos establecer que en vista de que el derecho de los trabajadores a organizarse y negociar colectivamente es de rango constitucional, debemos interpretarlo liberalmente a favor de las protecciones que la Constitución garantiza. *A.A.A. v. Unión de Abogados de la A.A.A.*, **2002 J.T.S. 155**, 158 D.P.R. ____ (2002).

La Orden de la Señora Gobernadora, aquí en controversia, disponía que los empleados de las agencias excluidas de la Ley de Personal se rigieran por sus reglamentos internos y convenios colectivos. En el caso de autos, el Artículo 20 Sección 2 del Convenio Colectivo vigente entre las partes disponía que esos días se considerarán como días libres sin pérdida de paga (sin cargo a licencia alguna). Dicha cláusula del convenio es clara y no deja lugar a dudas sobre la intención de las partes de que los días libres así declarados por la Gobernadora se tendrían como días feriados, sin cargo a licencia alguna. Ante el lenguaje claro de la cláusula, debemos atenernos a su sentido literal. *J.R.T. v. Vigilantes Inc.*, 125 D.P.R. 581, 592 (1990).

Es norma reiterada por nuestro Tribunal Supremo que cuando en un convenio colectivo se haya fijado una norma de trabajo o compensación más beneficiosa que las dispuestas por las leyes generales aplicables al

asunto, prevalecerá la más beneficiosa para el trabajador. *J.R.T. v. Vigilantes Inc., supra,* en la pág. 593; *Vega v. Yiyi Motors, Inc.,* 146 D.P.R. 373 (1998); *Ceferino Pérez v. Autoridad de Fuentes Fluviales,* 87 D.P.R. 118 (1963).

En el ámbito del derecho laboral se le reconoce amplia facultad a las partes en un convenio colectivo para regular y acordar condiciones de trabajo, horas y salarios, incluyendo compensaciones o beneficios marginales. Ello, siempre que los acuerdos no sean contrarios a la ley, la moral o el orden público, como se exige a cualquier otro contrato. No obstante la amplia discreción de las que gozan las partes en este tipo de transacción laboral, se ha resuelto, cónsono con la anterior limitación, que no pueden prevalecer cláusulas en un convenio colectivo que contravengan la política pública laboral en Puerto Rico, ni tampoco puede un árbitro pasar por alto esa política pública en un laudo, aun cuando se haya pactado que el mismo sea no conforme a derecho. *J.R. T. v. Vigilantes, supra,* en la pág. 593; *Pagán v. Fund. Dr. Pila,* 114 D.P.R. 224, 234 (1983); *Beachump v. Dorado Beach Hotels,* 98 D.P.R. 633 (1970).

Al igual que lo afirmado por este Tribunal en el caso de *C.F.S.E. v. Unión de Médicos de la C.F.S.E., supra,* entendemos que el señalamiento de la Oficina del Contralor en su Informe de Auditoría no impedía que la C.F.S.E. ponga en vigor lo acordado con la Unión en el convenio colectivo. Ello, en vista de que dicho acuerdo no es contrario a la ley, la moral o al orden público, ni viola la política pública sobre la utilización prudente de fondos públicos, contenida en el Art. VI, sec. 9 de la Constitución y en la Ley de Contabilidad Pública. Como correctamente señaló el Panel Hermano de este Tribunal en el referido caso, *"no estamos ante un caso de mal uso o extravagancia en el manejo de fondos públicos, que es lo que pretende conjurar la política pública de fiscalización".*

El acuerdo en controversia plasmado en el convenio colectivo, probablemente puede válidamente ser visto como uno que no refleje la manera más prudente de administrar los fondos de la C.F.S.E., en la medida que ese beneficio pueda lucir como una especie de regalía a los trabajadores y se convierte en un beneficio de privilegio para ellos. Ahora bien, no podemos adjudicarle a ese tipo de acuerdo violar las leyes o la Constitución sobre el uso de fondos públicos, ni la política pública sobre su efectiva fiscalización. Se trata de un beneficio marginal que puede perseguir un legítimo fin público, como el de motivar o estimular la producción de esos trabajadores, o podría tratarse de un *quid pro quo* con respecto a alguna concesión por parte de la Unión como parte del proceso de negociación del convenio. Incluso podría visualizarse como un atenuante al hecho de que se trata de una acción unilateral del patrono y no una acción voluntaria del trabajador, la que al cargarse a la licencia de vacaciones puede trastocar sus planes o preferencias y que podría, inclusive, responder a motivos o causas con los que no comulga el empleado, entre otros ejemplos.

En nuestros convenios públicos es conocida la negociación de beneficios parecidos, como la concesión de días libres por razón de paternidad, del día de cumpleaños, licencia por funeral, entre otros, sin cargo a licencia alguna. Aunque ellos *prima facie,* pueden lucir como una regalía, es también razonable entender que tras esos beneficios existen meritorios fines públicos que los justifican legal y constitucionalmente. Lo mismo puede decirse con respecto al beneficio que nos ocupa. Resolver lo contrario atentaría contra la armonía en las relaciones obrero-patronales en el sector público y pone en entredicho el principio de *pacta sunt servanda,* el cual goza de aun mayor preeminencia en el ámbito de la negociación colectiva por la fuerte política pública que le subyace.

Debe tenerse claro que las opiniones que rinde el Contralor de Puerto Rico, si bien son persuasivas y merecen deferencia, no son obligatorias ni concluyentes. Corresponde a los tribunales de justicia interpretar en última instancia la legalidad de los acuerdos en un convenio colectivo conforme al estado de derecho vigente. La Oficina del Contralor carece de autoridad para establecer política pública y para dictaminar la legalidad de los contratos, a la luz de esa o cualquier otra política pública aplicable. Sabemos que no fue ese el propósito, ni el alcance que pretendió conferirle el señor Contralor al Informe en el que fundamentó la C.F.S.E. su acción en

este caso. No hay nada de impropio en que el Contralor opine sobre prácticas que le puedan parecer ilegales o contrarias a la sana administración y uso de los fondos públicos. En efecto, ello es parte de sus funciones. Ahora bien, tales opiniones o determinaciones no son ni pueden ser concluyentes para la entidad pública auditada, sobre todo cuando ello incide en el cumplimiento de obligaciones contenidas en un convenio colectivo por su impacto precisamente sobre importantes cuestiones de política pública.

Evidentemente, incidió la C.F.S.E. al conferirle a tal interpretación u opinión el alcance aplicado en este caso. Igualmente, incidió el Foro de Instancia al sostener y validar tal curso de acción y al revocar el laudo emitido validando la cláusula en controversia.

En cuanto al primer señalamiento de error, la U.A.C.F.S.E. cuestiona que el T.P.I. haya emitido sentencia revocatoria del laudo de arbitraje cuando no tuvo ante sí documentos esenciales que fueron utilizados por el Comité en el proceso de emitir su decisión. Aduce que el T.P.I. *"emitió una Sentencia en la cual revoca un laudo de arbitraje en lo concerniente a sus méritos"* de forma ex-parte y basándose únicamente en la interpretación hecha por el Tribunal de Apelaciones en el caso de *C.F.S.E. v. Unión de Auditores de la C.F.S.E.*, *supra*, el cual presentaba una controversia similar a la de autos. Concluyó sobre el particular el TPI que:

*"Al presente, la política pública que definiese el Contralor en su informe de auditoría continúa vigente. Asimismo, no hemos podido identificar las razones por las cuales deberíamos hacer una determinación inconsistente a la determinación que hiciere el Tribunal de Apelaciones el 30 de junio de 2003 en el caso Corporación del Fondo del Seguro del Estado v. Unión de Auditores Internos de la Corporación del Fondo del Seguro del Estado."*

Para apoyar su posición y contradecir lo determinado por el foro de instancia en el párrafo anteriormente transcrito, la U.A.C.F.S.E. citó el caso *C.F.S.E. v. Unión de Médicos de la C.F.S.E.*, KLCE-2005-00611, el cual fue emitido por otro Panel Hermano de este Tribunal. En éste, el T.A. dispuso que:

*"Somos de opinión que el señalamiento del Contralor de Puerto Rico, que llevó al Administrador del FSE a dejar sin efecto lo convenido en el Artículo 20, Sección 2, del Convenio no impedía poner en vigor lo acordado con la Unión. El acuerdo entre el FSE y la Unión, objeto de esta controversia, no fue contrario a la Ley, a la moral o al orden público. Se efectuó en el ejercicio de los derechos constitucionales dados a los empleados del FSE por nuestra Constitución. Véase Artículo II. Sección 17, supra; AAA V. Unión de Abogados de la AAA, supra. Tampoco constituyó una actuación contraria a la política pública sobre la utilización prudente de fondos públicos. El FSE venía obligado a cumplir con lo pactado." Unisys v. Ramallo Brothers, supra.* ■

La U.A.C.F.S.E. aduce que los resultados diferentes a los cuales llegaron ambos paneles de este Tribunal en ambos casos se debe a que en el caso de la Unión de Médicos el T.P.I. *"contaba con la totalidad de los documentos necesarios para una revisión adecuada de la totalidad del expediente del caso"*.

Por otro lado, la C.F.S.E. sostiene que esos documentos no son esenciales para resolver el caso de autos, porque estamos ante un asunto de estricto derecho y de naturaleza constitucional. También aduce, a modo de ejemplo, que los memorandos especiales o cartas que emite la OCALARH *"son guías generales para las corporaciones públicas, [éstos] ofrecen orientación de cómo se debe de tratar o manejar un asunto de personal, pero no mandatan si un jefe de una agencia debe o no cerrar las operaciones de la agencia por un día concedido libre por proclama"*. Sostuvo, pues, que esas comunicaciones son únicamente de naturaleza persuasiva.

Sobre el particular, debemos comenzar por establecer que el Art. II, § 7 de la Constitución del Estado Libre Asociado, al igual que las Enmiendas V y XIV de la Constitución de Estados Unidos, garantizan que: *"ninguna persona será privada de su libertad o propiedad sin debido proceso de ley."* ■

El debido proceso de ley se manifiesta en dos vertientes distintas: la sustantiva y la procesal. Bajo el debido proceso sustantivo, los tribunales examinan la validez de una ley de manera que ésta no afecte de forma irrazonable, arbitraria o caprichosa, los intereses libertarios o propietarios de algún individuo o grupo. *Fuentes González v. Badillo*, **2003 J.T.S. 148** (2003), 160 D.P.R. ___ (2003); *Rivera Rodríguez v. Lee Stowell*, 133 D.P.R. 881 (1993). En su vertiente procesal, el debido proceso de ley le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo sólo ocurra mediante un procedimiento justo y equitativo con las debidas garantías y que respete la dignidad de los individuos afectados.

A la luz de la doctrina de *Mathews v. Eldridge*, 424 U.S. 319 (1976), la jurisprudencia ha establecido diversos requisitos que todo procedimiento adversativo debe cumplir para satisfacer las exigencias mínimas del debido proceso de ley, a saber: (1) notificación adecuada del proceso; (2) proceso ante un juez imparcial; (3) **oportunidad de ser oído**; (4) derecho a contrainterrogar testigos y examinar la evidencia presentada en su contra; (5) tener asistencia de abogado, y (6) que la decisión se base en la evidencia presentada y admitida en el juicio. *Fuentes González v. Badillo, supra*; *Rivera Rodríguez v. Lee Stowell, supra*. (Énfasis nuestro).

El derecho que tiene toda persona a ser oído antes de ser despojado de algún interés protegido se ha consagrado como principio fundamental del debido proceso. Esta oportunidad de ser oído debe ser en "*a meaningful time and a meaningful manner.*" *Mathews v. Eldridge, supra.*

El debido proceso de ley contiene como sustrato último la noción de lo justo. Dondequiera que un proceso judicial se haya conducido violentándose las reglas de juego justo (fair play) y se manifieste aun el asomo de la arbitrariedad, se quebranta el debido proceso de ley.

No hay duda de que haber dispuesto el T.P.I. de la Revisión presentada sin concederle a la parte recurrida en ese procedimiento la oportunidad de expresarse y poder oponerse al mismo en sus méritos, infringió el derecho Constitucional de esa parte al debido proceso de ley. Ello con mayor razón cuando la decisión emitida fue contraria a la posición de esa parte y le privaba del reclamo formulado ante el árbitro, en cuyo proceso había prevalecido. Como ya mencionamos, el derecho a defenderse y ser oído en cualquier procedimiento que real o potencialmente afecte intereses propietarios o libertarios, constituyó la esencia del debido proceso de ley en su vertiente procesal.

La existencia de una decisión de este Tribunal, la que, como es sabido, no establece precedente ni es, por tanto, obligatorio para otros casos, no puede justificar la privación de un derecho de tan elevada jerarquía, no obstante su similitud con el caso bajo consideración.

En cuanto a si era o no necesaria la documentación omitida para el perfeccionamiento del recurso, entendemos que en las presentes circunstancias, por tratarse esencialmente de un asunto de estricto derecho, el T.P.I. estaba en posición de atenderlo en los méritos que resultarán esos documentos absolutamente necesario. Ello de ninguna forma contradice la deseabilidad de que el Foro de Instancia hubiera podido contar con los mismos, lo que probablemente le hubiera facilitado una evaluación o examen más abordador y exhaustivo del caso.

No obstante lo anterior, de todos modos este error, aun de haberse cometido, como en efecto ocurrió en cuanto al debido proceso de ley, resultó inconsecuente, en vista de lo previamente decidido con respecto al error antes comentado. Por ello, resulta innecesario una consideración más detenida.

**IV**

Por los fundamentos anteriormente expuestos, se expide el auto solicitado, se revoca la sentencia recurrida y se reinstala el Laudo de Arbitraje emitido por el Comité de Querellas de la C.F.S.E.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

## ESCOLIOS 2006 DTA 96

**1.** Específicamente, este memorando especial disponía que:

"Con motivo del fallecimiento de Don Luis A. Ferré, quien fuera Gobernador de nuestra Isla durante el período de 1969 al 1973, la Gobernadora del Estado Libre Asociado de Puerto Rico, Hon. Sila María Calderón, decretó una semana de luto nacional.

En consideración al cambio en la fecha del sepelio, la Gobernadora dispuso que el próximo viernes 24 de octubre del 2003, se conceda el **día libre** a los empleados públicos **con cargo a licencia de vacaciones** para que puedan unirse al homenaje póstumo de nuestro pueblo a un distinguido empresario, ilustre político, promotor de las artes y servidor público.

Las oficinas del gobierno estarán **cerradas** al público. Las agencias deberán tomar las medidas necesarias para que no se afecten los servicios esenciales del Gobierno, y para que los empleados que acudan a trabajar ese día puedan realizar sus funciones. Para estos empleados, el viernes 25 de octubre será un día normal de trabajo.

Los empleados irregulares a quienes por necesidades del servicio se les requiera trabajar durante el tiempo concedido, recibirán compensación igual al tipo normal de paga que les fuera asignado.

Los empleados de Agencias Excluidas se **regirán por las disposiciones de sus convenios colectivos y sus reglamentos**. Los empleados de las diferentes municipalidades se regirán por lo que dispongan sus ordenanzas municipales.

Se deja sin efecto el Memorando Especial Núm. 42-2003, y el jueves 23 de octubre es un día trabajo en todo el gobierno." (Énfasis nuestro).

**2.** Las querellas Núm. 2003-02 y la Núm. 2003-03 fueron presentadas el 24 de noviembre del 2003. La querella Núm. 2004-01 se presentó el 12 de febrero del 2004.

**3.** De un examen al referido Informe surge que el Contralor tomó en consideración que existía un Convenio Colectivo que regulaba esta situación. No obstante, el Contralor sustentó su conclusión en "[l]as directrices impartidas por el Gobernador para la concesión del 4 de abril de 1996 y el 27 de marzo de 1997 libre con cargo a las licencias acumuladas. Además, en la Ley Núm. 230 del 23 de julio de 1976, según enmendada, conocida como la 'Ley de Contabilidad del Gobierno de Puerto Rico', se establece que las dependencias ordenarán obligaciones y desembolsos de fondos públicos únicamente por servicios, suministros de materiales y equipo reclamaciones u otros conceptos que estuvieran autorizados por ley. En consonancia con dichas normas de política pública, el Fondo debió conceder los días mencionados con cargo a las licencias acumuladas por los funcionarios y empleados".

**4.** Notificado y archivado el 28 de septiembre del 2004.

**5.** Las decisiones del T.P.I. y del T.A. a las cuales hace referencia la C.F.S.E. en su señalamiento de error fueron en el caso de *C.F.S.E. v. Unión de Auditores Internos de la C.F.S.E.*, KAC02-0255(506) y KLAN-03-00427, respectivamente. Las mismas serán mencionadas más adelante en la presente Sentencia.

**6.** Ello incluye a entidades privadas que reciban fondos públicos. *H.M.C.A. (P.R.), Inc. v. Contralor, supra.*

**7.** Recuérdese que las sentencias y resoluciones del Tribunal de Apelaciones pueden ser citadas con **carácter persuasivo**. Regla 11(D) del Reglamento del Tribunal de Apelaciones de 20 de junio de 2004, 4 L.P.R.A. Ap. XXII-B. Es decir, que éstas no obligan ni sientan precedentes, siendo las opiniones emitidas por el Tribunal Supremo las únicas que crean precedentes obligatorios.

**8.** El peticionado sostuvo que "siendo la Oficina del Contralor un organismo administrativo especializado, en este caso en auditorías y contabilidad pública, sus determinaciones "merecen gran consideración y respeto". San Vicente v. Policía de P.

*R.*, 142 D.P.R. 1 (1996); *Metropolitana S.E. v. A.R.P.E.*, 138 D.P.R. 200 (1995); *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 D.P.R. 567 (1993).

**9.** Surge de los autos que este caso fue en alzada al Tribunal Supremo y el mismo está pendiente para su resolución.

**10.** En el caso de la Constitución de los Estados Unidos se añade además el término vida, el cual se sustrajo de nuestra Constitución debido a su prohibición absoluta a la pena de muerte.